UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FRANK BARNES,

                                Petitioner,                    07 Civ. 2530 (RPP)

               - against -                       **OPINION AND ORDER**

SUPERINTENDENT H.D. GRAHAM,

                                Respondent.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On February 6, 2007, Frank Barnes ("Petitioner") brought this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his imprisonment for his convictions on February 25 and 26, 2002 of intentional murder in the second degree and felony murder following a jury trial in New York State Supreme Court, New York County. (Trial Transcript ("Tr.") 383, 397.)  The Respondent answered the petition on July 19, 2007, and by letter dated September 13, 2007, Petitioner demonstrated to this Court his repeated efforts at trying to obtain a copy of his trial transcript.  On September 24, 2007, the Pro Se Office in this Court mailed Petitioner a copy of his trial transcript.  Although Petitioner was given until December 7, 2007 to reply to the Respondent, he has failed to file any reply papers.

      Petitioner's conviction arose out of the homicide of David Burns on July 29, 1989, in the vestibule of Burns' apartment building at 622 West 114th Street in Manhattan.  After police officers interviewed several witnesses in the days after the murder, their suspicion focused on Petitioner, but he had disappeared from the

neighborhood where he had panhandled and slept for years.  The officers were unable to locate him until he was arrested twelve years later.

After a jury found Petitioner guilty on both counts in February 2002, but prior to sentencing, Petitioner moved to set aside the jury's verdict pursuant to N.Y. C.P.L. Section 330.30, claiming, among other things, that the People had failed to comply with Brady v. Maryland, 373 U.S. 83 (1963) (Declaration of Vincent Rivellese, dated July 18, 2007 ("Rivellese Decl.") Ex. A.)  After conducting a hearing, Justice Leslie Crocker Snyder denied Peititoner's motion in its entirety on December 2, 2002.  On January 14, 2003, Justice Snyder sentenced Petitioner to two concurrent, indeterminate prison terms of 25 years to life.

On November 22, 2004, counsel for Petitioner moved to vacate his conviction pursuant to N.Y. C.P.L. Section 440.10, asserting that his trial counsel had rendered ineffective assistance by failing to impeach two of the People's witnesses with omissions and inconsistencies between their trial testimony and their prior statements to police officers.  (Revellese Decl. Ex. D.)  The People opposed the motion.  (Revellese Decl. Ex. E.)  In an opinion dated June 20, 2005, the Honorable John Cataldo denied Petitioner's motion.  (Revellese Decl. Ex. F.)  On September 1, 2005, the Honorable Richard T. Andrias of the Appellate Division, First Department, granted Petitioner permission to appeal from that decision and consolidated the Section 440.10 appeal with Petitioner's direct appeal.

On appeal to the Appellate Division, Petitioner claimed that the verdict was against the weight of the evidence, that Justice Snyder wrongly rejected his 330.30 Brady claim, and that Justice Cataldo wrongly denied his 440.10 motion asserting ineffective

assistance of counsel.  (Revellese Decl. Ex. G.)  The People opposed.  (Revellese Decl. Ex. H).  Petitioner then filed a Reply Brief.  (Revellese Decl. Ex. I.)  On May 16, 2006, the Appellate Division, First Department, unanimously affirmed petitioner's conviction. See People v. Barnes, 29 A.D.3d 390 (1st Dep't 2006) (Revellese Decl. Ex. J.)

Petitioner's counsel sought leave to appeal to the New York Court of Appeals, which was denied by order dated July 24, 2006.  People v. Barnes, 7 N.Y.3d 785 (2006) (Revellese Decl. Ex. L.)

In his pro se petition, Petitioner re-asserts the three claims he raised on direct review: 1) that his conviction must be set aside because the jury verdict was against the weight of the evidence; 2) that the trial prosecutor violated Brady v. Maryland, 373 U.S. 83 (1963) by failing to provide the defense with discovery at the trial stage; and 3) ineffective assistance of counsel. (Petition at 2.)  For the reasons set forth below, the petition is denied.

**BACKGROUND**

Evidence at Trial

In July 1989, 32-year-old David Burns was a systems analyst living at 622 West 114th Street in Manhattan, mid-block between Broadway and Riverside Drive.  (Tr. 62-63.)  At the time, Burns was dating Paula Burg, who lived twelve blocks away, and the two frequently walked to each other's apartments.  (Tr. 35-36, 38.)

On the evening of July 28, 1989, Mr. Burns left his job, went to the gym, and then went to Ms. Burg's apartment. (Tr. 37.)  He left his gym bag at her apartment, and the couple went to a movie downtown. (Id.)  Afterwards, Mr. Burns returned to his girlfriend's apartment to retrieve his gym bag, and he left around 1:00 or 1:15 in the early

morning of July 29, 1989. (Tr. 38.)  According to Ms. Burg's testimony at trial, it would take approximately twelve to fifteen minutes to walk from her apartment to Mr. Burns' apartment. (Id.)

Sergeant Michael Gill testified that he and his partner responded to a radio dispatch of "calls for help" at 622 West 114th Street around 1:30 a.m. on July 29, 1989. (Tr. 44.)  Upon arriving at Mr. Burns' building, Sgt. Gill and his partner found Mr. Burns, wearing a suit, slumped in a corner of the vestibule with a large amount of blood coming from his chest. (Tr. 45.)  Sgt. Gill asked Mr. Burns "Are you all right? Are you all right?" but did not receive any response. (Tr. 45.)  A gym bag, a briefcase, and a set of keys lay on the floor next to Mr. Burns.  (Tr. 45, 47-53, 58.)  Sgt. Gill and another officer picked up Mr. Burns, put him in the back seat of a police car, and drove him to St. Luke's Hospital where he was pronounced dead. (Tr. 46.)

Patrick Queen, the editor of the alumni magazine at Columbia University, lived in Mr. Burns' building in July 1989, and he testified at trial that he had seen Petitioner "dozens" of times in the neighborhood. (Tr. 211, 213.)  Petitioner was often asking for money, seated on the steps of the dormitory or of the church across the street, hanging out, talking with people, and sometimes "shouting at people passing by." (Tr. 214.)  On the night of July 28-29, 1989, Mr. Queen came home by taxicab between midnight and 1:00 a.m. (Tr. 211-12.)  He exited the taxicab on Broadway across the street from a Columbia University dormitory called Hogan Hall. (Tr. 212.)  He saw Petitioner seated on a metal bar in front of the dormitory. (Tr. 212-213.)  Petitioner began repeatedly begging Mr. Queen for money as soon as Mr. Queen exited the taxicab. (Tr. 215.)  Mr. Queen politely refused to give Petitioner money, and Petitioner walked with him across

the street toward Mr. Queen's apartment building. (Tr. 215.)  Petitioner did not actually

enter the apartment building with him. (Tr. 222, 229.)  According to Mr. Queen, the outer

door to the vestibule of the building did not require a key in the summer of 1989, but a

key was required to enter the lobby. (Tr. 222-23.)

On cross-examination, Mr. Queen stated that being approached by Petitioner was

"not a new experience," (Tr. 228), and that Petitioner eventually stopped asking for

money. (Tr. 229.)  He also testified on cross-examination that Petitioner never tried to

grab any part of his body or his clothes, nor did he try to force Mr. Queen against a car or

towards a building or into any place. (Tr. 229.) Mr. Queen stated that generally, there

were other panhandlers in the vicinity of his apartment building late at night. (Tr. 227.)

After Mr. Queen's encounter with Petitioner, he went into his apartment

immediately at the top of the stairway, one flight above the lobby. (Tr. 218-219.)

Approximately half an hour after entering his apartment, Mr. Queen heard loud shouting

with a sense of "urgency." (Tr. 219.)  This was not the first time Mr. Queen heard

shouting in his apartment building, but he went to his door to listen to determine if

someone needed help. (Tr. 219.)  By the time Mr. Queen got to his door, the shouting had

ceased, and he assumed the conflict had been resolved. (Tr. 219.)

The next morning, Mr. Queen observed fingerprint dust throughout the lobby of

his building. (Tr. 220.)  He does not remember how he found out about Mr. Burns'

homicide, but once he did, he called the police and told them about his encounter with

Petitioner in the early morning of July 29, 1989.  (Tr. 221.)  After the night of the

homicide, Mr. Queen did not see Petitioner again until the date of trial, although he lived

at 622 West 114th Street for approximately one more year after the murder, and then he moved just around the block where he lived through the time of trial.  (Tr. 230-31.)

Mr. James Salter was also a homeless panhandler and drug addict in the neighborhood of 233 West 114th Street in the summer of 1989, although he had been sober for several years at the time of Petitioner's trial in 2002.  (Tr. 79-80, 84, 148.)  In 1989, Salter knew petitioner as "Frankie the Rapper."  (Tr. 80-81.)  The two met in the mid-1980s at the Broadway Presbyterian soup kitchen, and in 1989 Salter frequently encountered petitioner there, as well as elsewhere in the neighborhood where they both "hung out" and slept (Broadway and Riverside Park between 110th and 116th Streets and in the area subway stations).  (Tr. 72, 78-82, 149-50, 160, 172-74, 186.)  By 1989, Petitioner and Salter's friendship had cooled; Salter felt that Petitioner was too "wild" and attracted too much police attention.  (Tr. 84-85.)  Consequently, Salter dissociated himself with Petitioner because Salter was "trying to…get high" and did not want to go to jail; however, through July 1989, Salter still regularly encountered Petitioner at the soup kitchen and panhandling elsewhere in the neighborhood.  (Tr. 82-86.)

In the afternoon of Friday July 28, 1989, Salter ate a meal at the Broadway Presbyterian soup kitchen on 114th Street and Broadway.  (Tr. 86-87.)  Salter was not high, and he had not used drugs that day; he had used crack-cocaine that Thursday and for the two prior days.  (Tr. 87, 188.)  After his meal at the soup kitchen, Salter walked down 114th Street into Riverside Park, and he went to sleep on a bench approximately ten feet inside the park.  (Tr. 86-88, 173-76.)

Between approximately 1:30 a.m. and 2:00 a.m. on July 29, 1984, Salter awoke at the sound of Petitioner "dashing past" him.  (Tr. 88.)  Petitioner was approximately

twenty feet away from Salter, wearing a blood-stained white t-shirt, and mumbling, "I shouldn't have did it.  I shouldn't have did it.  He didn't have no money anyway." (Tr. 89-91.)  Salter testified that Petitioner had a knife in his right hand straight out in front of him sticking up from his fist, but Salter did not remember what kind of knife it was. (Tr. 93.)  Salter sat up on the bench and asked Petitioner "what are you talking about," at which point Petitioner "dashed off" South towards 110th Street. (Tr. 92, 94.)  Salter then sat on the bench for about a minute, got up and walked away. (Tr. 94.) At the time, he thought he heard some sirens, and he saw police cars "zooming" toward 114th Street. (Tr. 94.)

After the early morning of July 29, 1989, Salter saw Petitioner only twice.  (Tr. 95-97.)  First, sometime in August 1989, Petitioner approached Salter at a D'Agostino's Supermarket in the neighborhood where Salter was "cashing cans." (Tr. 186-87.) Petitioner put his hand on Salter's shoulder and said, "I heard you was walking around here telling people that I killed somebody."  (Tr. 186.)  A few weeks later, Salter was asleep on a bench at the 103rd Street subway station when Petitioner approached him, along with a man Salter knew as Petitioner's brother.  (Tr. 95-96.)  Peitioner displayed a six or seven-inch knife, stated "something [per]taining to somebody getting killed," and told Salter, "When the train comes, jump in front of it."  (Tr. 95-96.)  Petitioner's brother reached into his pocket, but Salter "dodge[d] them" by jumping onto the subway tracks and running to 110th Street. (Tr. 97.)  Soon after that incident, on August 26, 1989, Salter voluntarily went to the precinct and spoke to a detective about Petitioner. (Tr. 97-99.) The detective put Salter's statement in writing and Salter signed it. (Tr. 97-101.)

At trial, Salter admitted that he has numerous drug and theft related criminal convictions, and that he used "all drugs—cocaine, crack, heroin, and alcohol" for about twenty years. (Tr. 69, 75-78, 145.)  He also admitted that he had been arrested on numerous occasions for possession of drugs or drug paraphernalia, and that on one occasion he gave the officers a false name.  (Tr. 154-60.)  Of his drug use at that time, Salter testified, "after a three, four day binge, I would sleep for approximately a day or two.  As long as I had some food.  The only time I got up was to get some food." (Tr. 152.)  Salter had been using drugs for the three days prior to July 28-29, 1989, the night when he saw Petitioner with the knife, and he used drugs again in the days following. (Tr. 173-74, 183-84.)  At the time of his trial testimony, Salter had been "clean" from drugs for approximately five years, and since that time, he held numerous jobs for security companies. (Tr. 69, 71-72.)

Christopher Fay testified that, since 1983 or 1984, he had been working in various capacities at Columbia Presbyterian Church, which is located at the corner of Broadway and 114th Street in Manhattan, across the street from Burns' building. (Tr. 205.)  He began working as sexton as the church, and then in 1992 became the executive director of a program for the homeless. (Tr. 205-6.)  According to Fay, Petitioner spent a "great deal of time" at the soup kitchen and in that neighborhood from 1985 through July 1989, and Fay spoke with Petitioner frequently during that period.  (Tr. 207-08.)  During that time, Petitioner would "insistently" panhandle at the corner of Broadway and 114th Street, and Fay came to regard it as "Frank's spot."  (Tr. 207-08.)  At one point, Fay banned Petitioner from the soup kitchen because of Petitioner's "behavioral issues."  (Tr. 207.)

After Mr. Burns' homicide, Fay did not see Petitioner in the neighborhood. (Tr. 208-9.) The trial was the first time Fay saw Petitioner in person since 1989. (Tr. 209.)

At trial, Dr. Mark Flomenbaum, a forensic pathologist and First Deputy Medical Examiner for the City of New York, explained the injuries sustained by Burns and the cause of death.[1] (Tr. 107-112, 115.) Burns had one stab wound to the left side of his chest, over his heart. (Tr. 114, 121.) The knife had penetrated Burns' chest at a 45-degree upward angle, from right to left, toward his left shoulder. (Tr. 121-23, 129.) The angle of the wound indicated that Burns was turning away from the knife when he was stabbed. (Tr. 132.) The assailant then partially withdrew the knife and plunged it in again through the same hole, which left a second track internally. (Tr. 114, 124, 129, 135.) In other words, the assailant double-thrusted the knife through one stab wound, inflicting two internal injuries in a "Y" or "fork" shape. (Tr. 114, 122-24.) One prong of the wound proceeded through Burns' heart, and the other prong penetrated another portion of his heart, and also his left lung. (Tr. 122-24.) Burns bled to death as a result of the wounds. (Tr. 123, 130.)

The stab wound would have bled profusely, and such an injury was consistent with the pool of blood in the vestibule of Burns' building and on Burns' blood-soaked shirt and jacket. (Tr. 124-25, 136-37.) Further, the assailant would have had blood on him if he had come into contact with Burns' clothing. (Tr. 125, 132-33, 135.) Burns' white dress shirt and suit jacket, which had been removed at the hospital, were "very bloody," and each item had a hole that corresponded to Burns' stab wound. (Tr. 117-18, 134.) The knife used would have been covered with blood. (Tr. 125, 132-33.)

---

[1] On July 30, 1989, an autopsy was performed on David Burns by Dr. Vernard Adams, Deputy Medical Examiner. At the time of the trial, Dr. Adams was not with the Office of the Chief Medical Examiner. (Tr. 116.)

Flomenbaum demonstrated for the jury how the wound could have been inflicted by an approximately six foot tall, right-handed assailant during a face-to-face encounter.  (Tr. 128.)  A chest x-ray confirmed that no fragments from the knife were found in Burns' body.  (People's Exhibit 3.)  Each track was four inches long.  There was no bruising at the site of the stab wound, which would have indicated that the handle of the knife had pressed against Burns' chest.  Therefore, the knife was most likely more than four inches long.  (Tr. 120-23, 132.)

Angelo Cioffi, a first-grade detective in the New York City Police Department's Cold Case Squad, took over the investigation of Burns' murder in June 1996.  (Tr. 234-35.)  Detective Cioffi testified at trial that there was nothing of "forensic value at the scene of Mr. Burns' murder…[meaning] fingerprints, hair fibers, or anything else of any forensic value." (Tr. 236.)  In January 2001, Detective Cioffi interviewed Patrick Queen and James Salter and brought them to the District Attorney's Office to speak with prosecutors.  (Tr. 102, 236.)  On January 24, 2001, Cioffi arrested Petitioner in the Bronx, and at the time of arrest, Petitioner was 6'1" and weighed approximately 210 pounds. (Tr. 237.)

**DISCUSSION**

I. <u>Governing Law</u>

28 U.S.C. § 2254(d) reads as follows:

An application for a write of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respected ao any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### a. "Adjudicated on the merits"

For a claim to be "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001). A state court decision will be considered to be "adjudicated on the merits" as long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds." Aparico v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); see also Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005). Moreover, a state court's determination of a factual issue is "presumed to be correct," and that presumption may be rebutted only "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### b. Contrary to clearly established federal law

In Williams v. Taylor, the Supreme Court make very clear that a state court decision is "contrary to" or an unreasonable application of clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The Supreme Court also held that habeas relief is available only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies

that principle to the facts of the prisoner's case."  Id. at 413.  A federal court may not

grant relief "simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or

incorrectly."  Id. at 411.


II.  Petitioner's Claims

    a.  Weight of the Evidence

     Petitioner first claims that habeas relief should be granted because his conviction

was against the "weight of the evidence."  (Habeas Petition, Ground 1.)  28 U.S.C.

2254(a) makes clear, however, that habeas review is limited to federal claims, stating that

"a district court shall entertain an application for a writ of habeas corpus on behalf of a

person in custody pursuant to the judgment of a State court *only* on the ground that he is

in custody in violation of Constitution or laws or treaties of the United States" (emphasis

added).  "Weight of the evidence" claims stem, not from "violation of Constitution or

laws or treaties of the United States," but from New York C.P.L. § 470.15(5), which

allows an intermediate appellate court to reverse or modify a conviction where the court

determines that the verdict was, "in whole or in part, against the weight of the evidence,"

meaning that the "trier of fact has failed to give the evidence the weight it should be

accorded."  See People v. Bleakley, 69 N.Y.2d 490, 495 (N.Y. 1987) (distinguishing state

"weight of the evidence" claims from federal claims based on the legal sufficiency of the

evidence).

     Federal cases support the distinction between federal and state claims; it is well-

established that a "weight of the evidence" claim is not cognizable on federal habeas

review because it does not present a federal constitutional issue.  Taylor v. Poole, 538 F. Supp. 2d 612, 618 (S.D.N.Y. 2008); see also Tibbs v. Florida, 457 U.S. 31, 42-45 (1982) (distinguishing review for legal sufficiency from weight of the evidence review); Douglas v. Portuondo, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (holding that weight of the evidence claims are not cognizable on federal habeas review).

Here, the Appellate Division, First Department, affirmed Petitioner's conviction for two counts of Murder in the Second Degree, expressly rejecting Petitioner's contention that the verdict conflicted with the weight of the trial proof.  In its opinion, the court stated that "[t]he verdict was not against the weight of the evidence.  There is no basis for disturbing the jury's determinations concerning credibility.  [Petitioner] was connected to the crime by two independent witnesses." People v. Barnes, 29 A.D.3d at 390 (internal citations omitted). For the reasons stated above, this determination is not subject to habeas review, and accordingly, Petitioner's weight of the evidence claim is denied.

      b.  Brady claim

Petitioner claims that the prosecution violated its Brady obligations by failing to provide defense counsel with reports related to the recovery of a knife twenty days after the homicide from a windowbox of Burns' building.  This claim was first raised through N.Y.C.P.L. § 330.30 motion prior to sentencing and was denied.  On appeal, the Appellate Division held that there was no Brady violation because the evidence established that the knife was not present immediately after the murder, and that even if its subsequent appearance had been disclosed, "there was no reasonable possibility that it would have affected the verdict."  People v. Barnes, 29 A.D.3d at 390.  This claim is a

claim of violation of the Constitution of the United States, which Petitioner exhausted by seeking leave to appeal the claim to the Court of Appeals, a request that was denied. People v. Barnes, 7 N.Y.3d at 785.

### i.   Background

#### 1.   Petitioner's Motion

On March 26, 2002, prior to sentencing, Petitioner submitted a written motion, pursuant to N.Y.C.P.L. § 330.30, to set aside the jury's verdict on the ground that the prosecutor had withheld material, favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). (Revellese Decl. Ex. A.)  Specifically, after receiving a call from a resident of Burns' building, the New York Police Department recovered a knife from a window box in close proximity to the crime scene on August 18, 1989—three weeks after the homicide. (Revellese Decl. Ex. B at 1.)  In his motion papers, Petitioner alleged that the People violated its Brady obligations by withholding the following information regarding the knife: a DD5, a property clerk's invoice, a request for laboratory analysis, and the resulting reports of the analysis. (Revellese Decl. Ex. B at 1.)  Further, in a supporting affirmation, defense trial counsel stated that he had been told that "no weapon was recovered." (Revellese Decl. Ex. A.)  Petitioner argued that the knife "would have been an issue at trial," and that he would have sought a ruling from the court regarding any "purpose and weight the jury could consider" with respect to the knife. (Id.)

#### 2.   People's Response

In an Affirmation and Memorandum of Law dated May 12, 2002, with 19 exhibits attached, the People responded that the knife was not connected to the murder, and therefore was neither Brady material, nor evidence which, pursuant to C.P.L. Section

14

330.30, would create a "probability" that the verdict would have been more favorable to Petitioner.

The People stated in their affirmation that on July 29, 1989, members of the Crime Scene Unit of the NYPD responded to Mr. Burns' building and searched the area for evidence of forensic value, including a thorough search of the area both inside and immediately outside of the building.  (People's May 12, 2002 Affirmation ("People's Aff.") ¶ 11.)  In addition, members of the Emergency Services Unit of the NYPD arrived at the scene at 4:05 a.m. on July 29, 1989 and conducted a though search of the building and the area, including a dumpster to the east of the building, and used high power lights to search the outside of the building.  (People's Aff. ¶ 12.)  Nothing of value was recovered.  (Id.)

The People acknowledged that twenty days after the murder, on August 18, 1989, the superintendent of Burns' building called the police to report that there was a knife in a windowbox near the building's entrance. (People's Aff. ¶ 13.)  Detective Willie Grimball of the 26th Precinct went to Burns' building and observed a knife, oriented vertically with the blade pointing down and partially embedded in the soil, in a concrete windowbox to the immediate left of the entrance to the vestibule.  (Id.; People's Aff. Ex. 4, 5.)  Grimball vouchered the knife and submitted it for laboratory analysis, noting that it had a brown handle, that its tip was broken off, and that its approximately five-inch blade was "extreme[ly] rusted."  (People's Aff. Ex. 8, 9, 10; People's Aff. ¶ 13.)

On August 24, 1989, the police laboratory examined the knife and found no fingerprint or any other trace evidence on it.  (People's Aff. ¶ 14; People's Aff. Ex. 11.) On December 1, 1989, the Office of the Chief Medical Examiner conducted a serological

examination of the knife and concluded that there was no blood on it.  (People's Aff. ¶ 15; People's Aff. Ex. 12.)

The People pointed out that Dr. Flomenbaum, First Deputy Medical Examiner for the Office of the Chief Medical Examiner testified at trial that the knife used in the murder would have covered with blood after the stabbing.  (Tr. 124-25, 132-33.)  Further, Dr. Flomenbaum stated to the prosecutor that "it was highly unlikely that a person fleeing a crime scene would be able to successfully rid a knife of all traces of blood absent actually washing the knife."  (Paople's Aff. ¶ 16.)  It was even less likely that a rusty or corroded blade could be wiped clean of all traces of blood simply by wiping it off.  (Id.)  According to Dr. Flomenbaum, the delay in examining the knife for blood would not have affected the results.  (Id.)  In addition, a chest x-ray of Burns taken at the time of the autopsy indicated that there were no "retained metal fragments" inside Burns' body.  (People's Trial Exhibit 3; People's Aff. ¶ 10.)

On October 17, 2002, the trial judge ordered a hearing as to the limited issue of whether the window box was searched on the night of the homicide of Burns.  (Gov't Ex. C.)

### 3.  The Evidence at the November 20, 2002 Hearing

At the hearing on November 20, 2002, two officers who responded to the murder scene on the night of the 1989 murder testified.  Detective Richard Kreps, who was a detective in the NYPD's Crime Scene Unit, testified that he, along with his partner, spent two and a half hours on July 29, 1989 investigating and sketching the crime scene and searching the surrounding area for evidence. (Tr. 11/20/02 at 7, 15-16, 19, 21.)  As a matter of police procedure, he or his partner would have searched the window boxes

where the knife was subsequently found. (Tr. 11/20/02 at 8-10.)  Additionally, because it was a homicide, they would have done a more thorough search. (Tr. 11/20/02 at 14.)  Had any item been found during the search, it would have been listed in Kreps' report, as well as photographed and vouchered.  (Tr. 11/20/02 at 13.)  The only pieces of evidence recovered were the deceased's gym bag, briefcase and keys, a sample of the deceased's blood, and sawdust particles from the vestibule. (Tr. 11/20/02 at 15-20.)  Trial counsel elicited from Detective Kreps on cross-examination that he could not be sure that either he or his partner actually searched the window boxes that night. (Tr. 11/20/02 at 19.)  Detective Kreps also dusted the doors and the vestibule for fingerprints but found no prints of value. (Tr. 11/20/02 at 20.)

Sergeant Kenneth Bowen testified that in July 1989 he was assigned to Emergency Service Squad Number 1.  (Tr. 12/2/02 at 8.)  Although he did not have any independent recollection of the incident, he did review the notes from his memobook regarding the incident.  (Tr. 12/2/02 at 9.)  As a matter of procedure, Bowen and his partner would "start from the interior of the crime scene and work…outwards, searching from the building line to the curb side, … half a block in either direction."  (Tr. 12/2/02 at 10.)  After viewing a photograph of the building where Burns' lived and was killed, Bowen testified that the windowboxes would have been searched in the normal course of a crime scene search.  (Tr. 12/2/02 at 11.)

At the completion of the hearing, the trial judge made a factual finding that Detective Kreps' and Sergeant Bowens' testimonies were fully credible and that the windowboxes were searched the night of the murder and no knife was recovered.  (Tr. 12/2/02 at 47-54.)   On the issue of whether there was a reasonable possibility that the

verdict would have been different if the jury had the evidence about the knife, the People

argued that the medical examiner's report showed that no knife fragments were found in

the body, nor was there any evidence of rust or traces of blood on the knife.  (Tr. 12/2/02

at 60-61.)  At the conclusion of argument, the court found that there was no reasonable

possibility that the verdict would have been more favorable to Petitioner had the evidence

been disclosed.  (Tr. 12/2/02 at 66.)

ii.  Analysis

Petitioner renews his argument that the prosecutor's failure to disclose the

recovery of the knife was a Brady violation.[2]  Due process prohibits the prosecution from

suppressing material evidence in its possession which is exculpatory in nature, including

evidence which materially impeaches the credibility of a prosecution witness.  Brady v.

Maryland, 373 U.S. at 87; see Giglio v. United States, 405 U.S. 150, 154 (1972).

Evidence is material if "there is a reasonable probability that, had the evidence been

disclosed to defense, the result of the proceeding would have been different."  United

States v. Bagley, 473 U.S. 667, 682 (1985).  Bagley materiality requires that the

suppressed evidence be considered in the cumulative and together with the evidence

presented in the case.  Thus, the Constitution "is not violated every time the government

fails or chooses not to disclose evidence that might prove helpful to the defense." Kyles

v. Whitley, 514 U.S. 419, 436-37 (1995).  The test for a "reasonable probability" is

whether without the evidence, "he received a fair trial, understood as a trial resulting in a

verdict worthy of confidence."  Id. at 434.  The evidence must be favorable and material,

---

[2] Petitioner did not raise on appeal, and does not raise in his habeas petition, his 330.30 claim that the report relating to the knife constituted "newly discovered evidence" within the meaning of C.P.L. Section 330.30(3).

not just "potentially useful" to the defendant.  See Illinois v. Fisher, 540 U.S. 544, 548 (2003).

    The knife at issue here was not shown to be either favorable nor material, and therefore there was no requirement that the prosecutor produce it under Brady.  First, the finding by Justice Snyder that the knife was not Brady material was reasonable and not "contrary to, [nor did it involve] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  Two teams of trained crime scene detectives and ESU officers searched the scene that night for two and a half hours, and they did so with a particular focus on recovering the murder weapon.  Since the victim's body and belongings were found in the vestibule, the area of the vestibule and the exterior of the building would have been the natural focus of their search.  Both Detective Kreps and Sergeant Bown testified that they would have searched the windowboxes at 622 West 114th Street on the evening of the homicide in accordance with standard crime scene procedures.  This evidence shows that the knife was not in the windowbox on the night of the homicide, and therefore, as the trial court found, its recovery three weeks later not shown to be relevant to the case.   (Tr. 12/2/02 at 54.)

    Second, physical evidence further shows that the knife found in the windowbox twenty days after the homicide was not the murder weapon.  The serology laboratory of the medical examiner's officer tested the knife for blood, and the test was negative. (People's Aff. Ex. 12.)  The murder weapon, on the other hand, would have been covered with blood.  According to Dr. Flomenbaum, the First Deputy Chief Medical Examiner for the City of New York, there would have been "a lot of blood on the blade…the knife itself would be very bloodied."  (Trial Tr. 135.)  The wound would have been "spurting

as the knife came out and then went in the second time" and Burns would have immediately bled profusely from the stab wound.  (Id.)  Moreover, in conversations about Burns' homicide, Dr. Flomenbaum and another medical examiner, Dr. Robert Shaler, explained to the prosecutor that it would have been impossible for someone to wipe a bloody knife clean of all traces of blood, short of actually washing it.  (People's Aff. ¶ 16.)  Since the incident took place in the street and vestibule, and there was no showing of the availability of water to wash the knife, the likelihood of its being the murder weapon is highly unlikely—nor is it likely that the perpetrator would take a bloody knife away to wash it and bring it back to the murder scene.  Finally, the knife was covered in rust and had a missing tip, and the autopsy report and the forensic evidence contained nothing to suggest that Burns' wounds were inflicted by a rusted knife with a broken tip. The autopsy report did not indicate any rust or debris in the wound, or on the perforations from the knife on Burns' shirt or suit jacket, and no metal fragments were found in the wound.  (Trial People's Exhibit 3 at 2.)

Petitioner does not contend that any forensic evidence on the knife would have exculpated him.  Instead, Petitioner argues that Justice Snyder's findings below were contrary to federal law and that the jury could have determined that the knife found in the window was the murder weapon, which could have then been used to impeach James Salter.[3]  (Habeas Petition at 5.)  These arguments are without merit given that the

---

[3] Petitioner also states that since the knife was missing at the time of the trial, the medical examiner would not have been able to determine whether the knife was "consistent" with Burns' wounds since he would have had to examine the knife to make such a determination.  (Habeas Petition at 5.) However, a defendant must establish that evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed [or lost]."  California v. Trombetta, 467 U.S. 479, 488-89 (1984).  Given the forensic evidence and the fact that the trial court credited testimony that showed that the knife was not in the windowbox on the night of the homicide, the knife did not possess such an exculpatory value. Moreover, Petitioner does not assert that the knife was lost in "bad faith."  See Illinois v. Fisher, 540 U.S.

evidence discussed *supra* is strong evidence that the knife was not the murder weapon.
Petitioner offers only speculative statements about what the jury "could have" concluded
about the knife or "may well have found" with respect to Salter's credibility. (Id.) In
short, Petitioner does not make any showing that the knife found in the windowbox on
August 18, 1989 had any exculpatory value, and in fact, the People's evidence shows that
the knife was not connected to the murder. Accordingly, evidence of the knife could not
have impeached Salter's testimony that Petitioner had a knife on July 29, 1989, and there
is no reasonable possibility that the verdict would have different had it been disclosed to
the defense at trial. Justice Snyder properly denied Petitioner's motion.

     c.   <u>Ineffective Assistance of Counsel</u>

     Petitioner's third and final claim is that defense counsel Sol Schwatzberg's failure
to cross-examine James Salter and Patrick Queen on prior inconsistent statements
constitutes ineffective assistance of counsel. Petitioner exhausted this claim by seeking
leave to appeal to the Court of Appeals on that ground, and that request was denied.
<u>People v. Barnes</u>, 7 N.Y.3d at 785. This claim was first raised in a motion pursuant to
N.Y.C.P.L. § 440.10; on appeal, the Appellate Division explained, "Counsel made
reasonable strategic decisions not to impeach the two main prosecution witnesses with
insignificant or potentially explainable prior inconsistent statements. Were we to find
that counsel should have used this impeachment material, we would nevertheless find
that counsel's failure to do so did not affect either the fairness or the outcome of the
trial." <u>People v. Barnes</u>, 29 A.D.3d at 390-91. Here, as discussed *infra*, Petitioner's

---

544 (2003) (no <u>Brady</u> error where exculpatory value of lost or destroyed evidence is speculative and loss or
destruction was not in bad faith).

ineffective assistance of counsel claim fails because it does not pass the two-prong test set forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

> i.   The Proceedings Below

By papers dated November 22, 2004, Petitioner moved by counsel for an order vacating his conviction, asserting that his trial counsel had rendered ineffective assistance. Specifically, Petitioner contended that trial counsel Sol Schwartzberg failed to use prior statements memorialized in police reports ("DD5s") to impeach James Salter and Patrick Queen (D. Aff. ¶ 7.[4])

First, Petitioner asserted that counsel failed to impeach Salter's trial testimony that he saw the Petitioner carrying a knife on the night of the murder with purported prior omissions and inconsistent statements to the police. Specifically, Petitioner argued that counsel should have confronted Salter with his first two statements to the police, which did not mention that petitioner was holding a knife in the park, contrary to Salter's trial testimony. (D. Aff. ¶ 24; D. Mem. 5-6.) Next, Petitioner argued that defense counsel should have cross-examined Salter on the purported inconsistencies between his trial testimony that Petitioner had pulled a knife on him in the subway confrontation and his earlier statement to police that Petitioner had reached under his shirt as if he had a weapon. (D. Mem. 6-7.)

With respect to Queen, Petitioner complained that counsel had failed to attack the alleged inconsistencies between his trial testimony that petitioner had followed him to the door of 622 West 114th Street, and his prior statements to the police that Petitioner had crossed Broadway with him and then asked a woman exiting a cab for money. (D. Mem.

---

[4] Parenthetical references to "D. Aff." and "D. Mem." refer to the Section 440.10 motion papers filed by the Defendant on November 22, 2004. (Revellese Decl. Ex. D.)

6-7.)  Petitioner contended that had defense counsel cross-examined Salter and Queen along these lines, it would have created a reasonable doubt in the minds of the jury. Moreover, if either witness had denied his prior statements, Petitioner argued, he could have admitted the relevant portions of the DD5 into evidence.  (Id.)

In her affirmation in support of Petitioner's motion, appellate counsel stated that she had spoken with Mr. Schwartzberg twice about the trial, that he had provided her with his trial file, and that on one occasion he had told her that his decision not to cross-examine Salter about the DD5s was based at least in part on "a judgment call because he had been wary of having Mr. Salter reiterate the events to the jury." (D. Aff. ¶ 31-33.) Appellate counsel also related that Mr. Schwartzberg had asked to see his trial file again so that he could further elaborate on his trial cross-examination strategy, and she had returned the file to Mr. Schwartzberg for that reason.  (Id.) Appellate counsel had attempted to reach Mr. Schwartzberg several times after that, but he had not returned her calls as of the filing of Petitioner's 440.10 motion.  (Id.)

The People opposed petitioner's motion in papers dated May 18, 2005.  They argued that Petitioner had failed to offer a sufficient explanation for not including an affidavit from trial counsel.  In any event, they argued, Mr. Schwartzberg had explained that his cross-examination decisions were "strategic" ones, designed to limit the repetition of Queen's and Salter's damaging testimony.  Since those decisions were reasonable ones, the People contended, they did not constitute ineffective assistance of counsel.  In addition, the People reviewed Mr. Schwartzberg's efforts on Petitioner's behalf and argued that he had made appropriate pre-trial motions, had made appropriate objections and legal arguments during trial, and had extensively cross-examined witnesses where appropriate, including

examining Salter regarding his drug and alcohol use and criminal record in an effort to show that he was an unreliable witness.

By decision and order dated June 20, 2005, the Honorable John Cataldo denied petitioner's motion without a hearing.  The court determined that a hearing was unnecessary because the reports at issue had been made part of the record and petitioner's moving papers set forth conversations with Mr. Schwartzberg that contained, "to the extent of his current memory," Mr. Schwartzberg's explanation for his decision not to use the impeachment materials at trial, namely, that he was wary of having Salter reiterate his account of the incident to the jury. (Revellese Decl. Ex. F at 3.)

After thoroughly reviewing the trial evidence, the prior statements at issue, and the details of counsel's performance before, during and after trial, Justice Cataldo concluded that Mr. Schwartzberg's performance "evidenced his thoroughness and preparedness, his active and single-minded advocacy for his client's rights, and a clear defense strategy." (Revellese Decl. Ex. F at 12.)  In light of Mr. Schwartzberg's "overall capable and skillful advocacy," the court found that his failure to use the impeachment materials at issue did not rise to the level of ineffective assistance of counsel. (Revellese Decl. Ex. F at 12.)  In that regard, Justice Cataldo found that the impeachment materials were not "strikingly inconsistent" and would not have "significantly impaired" the credibility of Salter and Queen. (Id.)

In particular, Justice Cataldo noted that, from his first statement to the police, Salter had never wavered in his assertion that he saw Petitioner running in the park, with a large blood stain on his t-shirt, muttering words to the effect that he "shouldn't have done it, he didn't have any money on him anyway." (Revellese Decl. Ex. F at 12.)  Thus, the court

found, the failure to mention the knife in the first two statements "could easily have been explained as an omission by the recording detectives."  By focusing the jury's attention on the earlier statements in the DD5s, defense counsel risked bolstering  the inculpatory aspects of Salter's testimony, i.e., such cross examination would only work to his client's detriment by reinforcing that Salter had voluntarily come to the police precinct and identified Petitioner and his bloody clothing as well as his statements about a month after the killing. (Id.)  Under these circumstances, Mr. Schwartzberg's "decision not to highlight" Salter's version of events, and instead to concentrate on impeaching his credibility through his drug and alcohol use and criminal history was, "viewed objectively," a "valid defense strategy." (Revellese Decl. Ex. F at 12-13.)

Similarly, the court found that confronting Queen with the fact that he initially reported to the police that Petitioner had walked with him across Broadway, but that he had testified at trial that Petitioner had walked with him partly down his block, was not substantially inconsistent.  Rather, "under either version, [petitioner] was aggressively seeking money from Mr. Queen within a half block of the homicide scene only minutes before the crime occurred." (Revellese Decl. Ex. F at 13-14.)   Thus, Mr. Schwartzberg's decision not to use the DD5s at issue was a valid strategic decision and did not compromise Petitioner's right to a fair trial. (Revellese Decl. Ex. F at 14.)

ii.  Analysis

A defendant is entitled, under the Constitution, to the effective assistance of counsel.  U.S. Const., Amend. VI.  Strickland v. Washington, 466 U.S. 668, 694 (1984), sets forth a two-part test to determine if counsel's assistance is ineffective: "First, the

[petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." 466 U.S. at 687; accord Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005). This performance is to be judged by an objective standard of reasonableness and judicial scrutiny is to be "highly deferential." Strickland, 466 U.S. at 688-89.  The Supreme Court noted that "[i]t is all too tempting . . . to second-guess counsel's assistance after conviction . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.  Moreover, Petitioner must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 689.

Second, a petitioner "must show that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.  Performance of counsel must be considered in the aggregate, with a view of the totality of the evidence before the judge or jury.  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 695-96). The inquiry should focus on the fundamental fairness of the trial and whether, despite a strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  Id.

Further, an attorney's representation is presumed effective, and a defendant alleging ineffectiveness of counsel bears the burden of demonstrating deficient

performance and prejudice.  See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)

("There is a strong presumption that counsel's performance falls within the wide range of

professional assistance, [and] the defendant bears the burden of proving that counsel's

representation was unreasonable under prevailing professional norms and that the

challenged action was not sound strategy") (internal citations and quotations omitted).

Here, the record fails to establish ineffective assistance generally, and more

specifically to Petitioner's claim that trial counsel failed to impeach witnesses with prior

inconsistent statements, the record shows that counsel had strategic reasons for the

alleged omission.  In short, Justice Cataldo's decision that trial counsel was competent

and effective was reasonable given the record.  Mr. Schwatzerber filed full and

appropriate motions including a demand for inspection of the grand jury minutes, a

Sandoval hearing, the suppression of identification testimony, a bill of particulars, and

pre-trial discovery.  He also filed an affirmation complaining that he had not received

sufficient discovery, and then pressed his argument prior trial that there were "things

missing" from the Rosario and discovery materials he received.  (Pre-Trial 3[5].)   In so

doing, counsel displayed knowledge of the disclosed materials and made a showing that

there were earlier DD5s not previously disclosed.  (Pre-Trial 3-5.)  These efforts were

successful, and additional DD5s were turned over.  (Pre-Trial 10-12.)

In addition, after a Sandoval hearing, Mr. Schwartzberg won a ruling preventing

the prosecutor from eliciting the underlying facts of Petitioner's 1984 attempted second-

degree robbery conviction: that petitioner robbed a woman as she was entering the

vestibule of her building on the upper west side, and that in so doing, he and his

---

[5] Parenthetical references to "Pre-Trial" refer to proceedings before Justice Snyder on February 19, 2002.

accomplices had thrown her to the ground, slammed her head into the ground, and stolen her pocketbook.  (Sandoval 3-14.)

With respect to Salter and Queen, trial counsel's cross-examinations were extensive.  Mr. Schwatzberg did not allow Salter to simply concede his drug addition and lengthy rap sheet.  (Tr. 165.)  Instead, Mr. Schwatzberg forced Salter to elaborate on the dates, locations, and underlying facts of each crime from his twenty-year record, and he pressed Salter to name every drug and type of alcohol he had used and for how long.  (Tr. 142-172.)  He also questioned the plausibility of Salter's account.  (Tr. 174-85, 188-91.)  On cross-examination of Queen, Mr. Schwatzberg elicited that Petitioner never touched him on the night of the murder and that it was not uncommon for panhandlers to approach him in his neighborhood.  (Tr. 227-29.)

Trial counsel made the strategic decision not to question Salter about the prior statement made in the DD5 because he felt it would only highlight the damaging aspects of Salter's testimony.  (D. Aff. ¶ 32.)  Likewise, as Justice Cataldo noted, Queen's prior statements to the police were not "strikingly inconsistent" and would not have "significantly impaired" Queen's testimony.  While impeaching Queen with his initial statement that Petitioner followed him only to the median on Broadway would have placed Petitioner "slightly further from the scene of the crime," it was not such a significant discrepancy that it would have undermined Queen's credibility.  (Revellese Decl. Ex. F at 13-14.)  In short, Petitioner fails to provide a basis to reject Justice Cataldo's finding that there were several tactical reasons why a competent attorney might decide to forego cross-examination of Salter and Queen with the DD5s.  In light of the marginal impeachment value of the DD5s in light of the other evidence presented, there

was no "reasonable probability" that, had Schwartzberg cross-examined Salter and Queen with the DD5s, the Petitioner would have been acquitted.  Strickland v. Washington, 466 U.S. at 694.  Nor did Mr. Schwartzberg's strategic decision not to use the DD5s in his cross-examination compromise the fundamental fairness of petitioner's trial. Kimmelman v. Morrison, 477 U.S. at 374.  Accordingly, Justice Cataldo properly concluded that Petitioner received effective assistance of counsel; Petitioner's ineffective assistance of counsel claim is denied.

   d.   Conclusion

   For the reasons stated above, the petition is denied.  As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See Lozada v. United States, 107 F.3d 1011, 1016-17 (2d Cir. 1997), abrogated on other grounds, United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438 (1962).

IT IS SO ORDERED.
Dated: New York, New York
      May ___, 2009

                                        _____
                                             Robert P. Patterson, Jr.
                                             United States District Judge

was no "reasonable probability" that, had Schwartzberg cross-examined Salter and Queen with the DD5s, the Petitioner would have been acquitted. Strickland v. Washington, 466 U.S. at 694. Nor did Mr. Schwartzberg's strategic decision not to use the DD5s in his cross-examination compromise the fundamental fairness of petitioner's trial. Kimmelman v. Morrison, 477 U.S. at 374. Accordingly, Justice Cataldo properly concluded that Petitioner received effective assistance of counsel; Petitioner's ineffective assistance of counsel claim is denied.

### d. Conclusion

For the reasons stated above, the petition is denied. As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. See Lozada v. United States, 107 F.3d 1011, 1016-17 (2d Cir. 1997), abrogated on other grounds, United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438 (1962).

IT IS SO ORDERED.
Dated: New York, New York
     May 19, 2009

Robert P. Patterson, Jr.
United States District Judge

29